

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-17-00811-CV

Richard O. **WEED**, Timothy A. Weed, and Rees R. Oliver III,
Appellants

v.

**FROST BANK**, Individually and as Independent Executor
of the Estate of Rees R. Oliver, Jr., Deceased,
Appellee

From the Probate Court No. 2, Bexar County, Texas
Trial Court No. 2011-PC-2024A
Honorable Tom Rickhoff, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:      Sandee Bryan Marion, Chief Justice
              Karen Angelini, Justice
              Patricia O. Alvarez, Justice

Delivered and Filed:  November 14, 2018

AFFIRMED

At issue in this appeal from a summary judgment signed by the probate court is the characterization of certain oil and gas interests purchased by Rees R. Oliver Jr. during his marriage to Elizabeth Oliver. Appellants Richard O. Weed, Timothy A. Weed, and Rees R. Oliver III ("the Weed Appellants"), who are all beneficiaries named in Rees's will, contend the oil and gas interests were Rees's separate property as a matter of law. Frost Bank, the independent executor of Rees's estate, argues the oil and gas interests were community property as a matter of law.

Because we conclude the oil and gas interests at issue in this appeal were community property as a matter of law, we affirm.

## BACKGROUND

In 2011, Rees R. Oliver Jr. died and was survived by his wife of twenty-one years, Elizabeth Oliver. In his will, Rees made several bequests to his wife, including his Bexar County real estate, his interest in a San Antonio partnership, and several bank accounts that were styled as his sole and separate property. He left the residue of his estate in the following percentages: 20% to his son Rees R. Oliver III; 10% to each of his nephews, Richard O. Weed and Timothy A. Weed; and the remaining 60% to Keystone School and his step-grandchildren from his first marriage. Before his marriage to Elizabeth, Rees worked as a stockbroker, managed other people's investments, graduated from law school, owned a 25% interest in a storage business, and had a partnership with his sister. Rees also owned multiple real property interests, including some oil and gas interests. After his marriage to Elizabeth, Rees continued investing in multiple mineral interests, both in Texas and in other states. According to Elizabeth, throughout their marriage, Rees was a sole proprietor engaged in the acquisition, exploration, and development of oil and gas interests.

At issue in this appeal are multiple oil and gas interests acquired by Rees during his marriage to Elizabeth. The deeds of each of these oil and gas interests specify that the grantor had conveyed the oil and gas interest to "Rees R. Oliver, Jr., as his sole and separate property and estate."[1]

---

[1] The probate court identifies these oil and gas interests by attaching two exhibits to its order granting summary judgment. Exhibit A lists over fifty oil and gas interests conveyed by deed. Exhibit B includes an operating agreement from which Rees acquired an oil and gas interest. The probate court's order declared the oil and gas interests specified in Exhibits A and B to be community property.

In attempting to characterize whether these oil and gas interests were community property or Rees's separate property, Frost Bank, the independent executor, attempted to locate financial records to trace the source of funds used to purchase the oil and gas interests. Unable to locate the financial records necessary to trace the source of funds used in the transactions, Frost Bank relied on the community property presumption and concluded the oil and gas interests should be characterized as community property.

Frost then filed a declaratory judgment action naming the beneficiaries of the will as defendants and requesting the probate court to declare the oil and gas interests to be community property. The Weed Appellants filed counter-petitions for declaratory judgment and counterclaims against Frost Bank for breach of fiduciary duty. Both the Weed Appellants and Frost Bank filed motions for partial summary judgment on the characterization issue, which were both denied by the probate court. Later, before a trial setting, Frost, in its dual capacities, moved again for partial summary judgment on the characterization issue. This time, the probate court granted partial summary judgment in favor of Frost Bank, declaring the oil and gas interests to be community property and denying the Weed Appellants' request that the oil and gas interests be declared Rees's separate property. The probate court then severed "Frost's claim for declaratory judgment on the nature of the [oil and gas interests] and the counter claims for declaratory judgment on the [oil and gas interests] asserted by [the Weed Appellants]" and assigned them a new cause number, making the partial summary judgment a final, appealable judgment. The Weed Appellants appealed, arguing the trial court erred in granting summary judgment on the characterization issue.

## STANDARD OF REVIEW

To obtain a traditional summary judgment under Texas Rule of Civil Procedure 166a(c), a party moving for summary judgment must show that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Randall's Food*

*Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). "An issue is conclusively established if reasonable minds could not differ about the conclusion to be drawn from the facts in the record." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017) (citation omitted). Once the movant has established a right to summary judgment, the burden shifts to the respondent to present evidence that would raise a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). We review a trial court's order granting summary judgment de novo, taking as true all evidence favorable to the respondent and indulging every reasonable inference and resolving any doubts in the respondent's favor. *Cmty. Health Sys.*, 525 S.W.3d at 680 (citation omitted).[2]

### DISCUSSION

On appeal, the Weed Appellants argue the probate court erred in concluding the oil and gas interests were community property as a matter of law, because they argue the deed recitals granting the oil and gas interests to "Rees R. Oliver, Jr., as his sole and separate property and estate" create a separate property presumption that replaces the community property presumption. Thus, they argue the burden shifted to Frost Bank to produce evidence that the oil and gas interests were, in fact, community property. And, because it is undisputed the financial records necessary to trace the source of funds used to purchase the oil and gas interests no longer exist, the Weed Appellants contend the trial court should have declared the oil and gas interests were Rees's separate property. Alternatively, they argue issues of material fact exist that prevent summary judgment being granted in favor of Frost Bank. In response, Frost Bank argues no separate property presumption

---

[2] In their brief, the Weed Appellants argue the probate court based its summary judgment on the wrong standard of review by applying an abuse of discretion standard to Frost Bank's characterization decisions. However, because we review a trial court's summary judgment under a de novo standard of review, whether the probate court applied an erroneous standard does not matter for purposes of this appeal.

applies to this case. According to Frost Bank, because the oil and gas interests were acquired during Elizabeth and Rees's marriage, the community property presumption applies. Therefore, because the tracing of funds is not possible in this case, Frost Bank contends the probate court correctly applied the community property presumption and declared the oil and gas interests to be community property as a matter of law. Alternatively, Frost Bank argues that even if the deed recitals created a separate property presumption, then the oil and gas interests should still be characterized as community property because the summary judgment evidence shows Rees used his time, toil, and talent to acquire the oil and gas interests.

### A. Separate and Community Property Defined

All property owned by either party to a marriage is either separate property or community property. A spouse's separate property consists of (1) the property owned or claimed by the spouse before marriage, (2) the property acquired by the spouse during marriage by gift, devise, or descent, and (3) the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage. TEX. FAM. CODE ANN. § 3.001. Unless otherwise agreed to in writing by both spouses, community property consists of the property, other than separate property, acquired by either spouse during marriage. *Id.* §§ 3.002, 4.002-.003.

All property, both real and personal, of a spouse owned or claimed before marriage is the separate property of that spouse. TEX. CONST. art. 16, § 15; TEX. FAM. CODE ANN. § 3.001(1). In determining whether property is "owned or claimed" by a spouse prior to marriage, the doctrine of inception of title may be applicable. Under the doctrine, the character of the property is generally determined not by the date of acquisition of final title, "but by the origin of title to the property." *Roach v. Roach*, 672 S.W.2d 524, 531 (Tex. App.—Amarillo 1984, no writ). That is, when the right to property accrues prior to marriage, the property is separate even though the property or legal title is not received until after the marriage. *Welder v. Lambert*, 91 Tex. 510, 44 S.W. 281,

284-85, 286 (1898). Additionally, the doctrine of tracing should be considered. Under this doctrine, mutations and changes in the form of property do not affect its character as separate property so long as it can be definitely traced and identified. *Tarver v. Tarver*, 394 S.W.2d 780, 783-86 (Tex. 1965).

Further, property possessed by either spouse during or on dissolution of marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003. The presumption may be rebutted by clear and convincing evidence. *Id.* § 3.003(b). "Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property" by tracing the property to its separate property origin. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011); *see Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975). "[W]hen the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the burden is not discharged and the statutory presumption prevails." *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973).

### B. Community Property Presumption vs. Separate Property Presumption

In this appeal, Frost Bank argues the community property presumption applies because it is undisputed that the oil and gas interests were acquired by Rees during his marriage to Elizabeth. And, because it is also undisputed no financial records exist to trace the source of funds used to purchase the oil and gas interests, Frost Bank argues that the Weed Appellants cannot overcome the community property presumption, and the trial court correctly characterized the oil and gas interests as community property. In contrast, the Weed Appellants argue because the deeds recited the oil and gas interests were conveyed to Rees as his sole and separate property, the community property presumption is replaced by a separate property presumption. Thus, they contend the burden shifted to Frost Bank to bring forth evidence that the oil and gas interests were purchased with community funds. And, because it is undisputed no financial records exist to make tracing

possible, they argue Frost Bank cannot meet this burden as a matter of law. Given that the parties argue two different presumptions apply, we must first address whether the community property presumption or a separate property presumption applies to this appeal.

### 1. Separate Property Presumption Based on Implied Gift

In researching this issue, we have found supreme court precedent dating to the late 1800s. In 1892, the supreme court considered whether the community property presumption applied where the wife acquired the land in question during her marriage and the deed recited that the consideration "was paid by her out of her separate property and that the land was conveyed to her as her separate property." *McCutchen v. Purinton*, 84 Tex. 603, 19 S.W. 710, 710 (1892). The court explained at trial, "[n]o evidence was offered to prove that the $1,120 purchase money for the land was the separate property of [the wife]." *Id.* The appellant's argument was the same one presented by Frost Bank in the instant case: because "the facts show that the land was conveyed upon a valuable consideration to" the wife during her marriage, "it must be presumed to have been community property," and "to defeat such presumption it was incumbent upon [the wife's heirs] to prove that the consideration paid was the separate property of the wife." *Id.* The supreme court presented the following questions: "Do the express recitals of the deed overcome this presumption? Can they be treated as evidence of the source of consideration?" *Id.* The supreme court concluded that it could "see no good reason why a deed containing such recitals should not remove the presumption that would exist in favor of the community in their absence, and be given the effect, when uncontradicted or unexplained, of vesting the title according to the terms of the deed." *Id.* at 711. According to the supreme court, "[i]f such recitals are untrue, and the payment of the consideration was in fact made with community funds, the evidence thereof would be admissible in a proper case to establish a resulting trust in favor of the community estate, as in other cases

where the title is conveyed to one party, and the purchase money is paid by another." *Id.* The supreme court reasoned that the husband was necessarily a party to such a transaction:

> The husband has the management of both community property and the separate estate of his wife, and when a deed containing recitals like the one now under consideration is found to have been made during the existence of the marriage, and no evidence is offered to explain or qualify it, the presumption must be indulged that it was made with the knowledge and consent of the husband, and for the purpose of making the property the separate estate of the wife. Such transactions may be intended as a fraud upon creditors and may be attacked upon that ground, but no such issue was made in this case.

*Id.* Therefore, the supreme court affirmed the judgment declaring the property was the wife's separate property. *Id.*; *see also Brick & Tile, Inc. v. Parker*, 143 Tex. 383, 186 S.W.2d 66, 66 (1945) ("Since the property was acquired during the marriage of [husband] and wife, it was presumably their community property, and this presumption prevails even though the deed was taken in the name of the wife, *in the absence of language in the deed tending to show that it was purchased with separate funds of the wife, or that it was conveyed to her as her separate property*.") (emphasis added); *Smith v. Buss*, 135 Tex. 566, 144 S.W.2d 529, 532 (1940) (holding that deed recitals stating property was conveyed to wife "out of her own separate property, funds and estate" "prima facie show that at the very time [the wife] acquired the land thereby conveyed, she took the entire title in her separate right, and not in community").

### 2. Supreme Court in Hodge *makes distinction based on spouse being a party to the deed transaction.*

The supreme court's reasoning in *McCutchen* appears to be based on the concept of the wife being gifted the husband's interest in community property through his consent and participation in the deed transaction. *See* TEX. FAM. CODE ANN. § 3.001 ("A spouse's separate property consists of . . . the property acquired by the spouse during marriage by gift, devise, or descent . . . ."). In 1955, in *Hodge v. Ellis*, 154 Tex. 341, 277 S.W.2d 900 (1955), the supreme court specifically addressed the situation where a husband was a party to a deed transaction and

the situation where he was not a party to the transaction. The dispute in *Hodge* was between the surviving husband and the executor of his wife's estate over the characterization of three properties acquired by the wife during the marriage. *Id.* at 901. Each deed in question stated that the property was conveyed to the wife as her separate property. *Id.* at 902. No bank records existed from which one could trace the source of funds used for the purchases. *See id.* at 903. The husband testified that "he knew generally about the purchase of each property, including the price of at least one" and that he had inspected one or more "in advance of closing." *Id.* at 904. The supreme court noted that "despite the prompt record of each deed at the city of their residence and even his admitted signature on the bank note for the Wilson purchase, [the husband] insisted that he never knew of, or consented to, the terms of the deeds in so far as they purported to make the respective premises the separate property of the [wife]." *Id.*

The supreme court in *Hodge* explained that the community property presumption is "sometimes displaced by a presumption in favor of the separate estate of the wife where the deed of acquisition recites *either* that the land is conveyed to her as her separate property, *or* that the consideration is from her separate estate, *or* includes both types of recitation." *Id.* (emphasis added). "This latter presumption, like most others concerning the same subject matter, is generally rebuttable." *Id.* "And its importance, of course, lies in the manner of its application to particular sets of facts." *Id.*

The supreme court then distinguished a set of facts where the husband is a party to the deed transaction and where he is not:

> For example, where . . . the husband is a party to the transaction, the result generally is to hold the property to be separate property of the wife, *even though the consideration be community or from the separate estate of the husband*, and *even though the husband on the trial denies that the purchase was by way of a gift* of either to the wife. And in such cases where all or part of the consideration is contractual, as where, for example, the deed to the wife stating the conveyance to be for her separate benefit and in consideration of her separate funds, is made

pursuant to an installment purchase contract of the husband and wife, itself expressly providing for the payments to be made from her separate funds, *we have invoked the parol evidence rule to exclude proof by the husband that the consideration was actually community and the purchase actually for community benefit. . . . Where the husband is a party to the purchase* for the purported separate interest of the wife, even though his name may not appear in the documents, (see *Smith v. Buss*[, 135 Tex. 566, 144 S.W.2d 529 (1940)]), *there is good reason to presume the recitals in the deed to be true, because his position as regards the wife and the community is much the same as if he were the grantor*, and in the latter situation it would be at least unusual that he should intend to convey to the community when the property was already community or even where it was his separate property. Such a construction would be equivalent to holding that it passed the title from the community to the community; or, in other words, that it passed nothing.

*Hodge*, 277 S.W.2d at 904 (emphasis added).

The supreme court then addressed the set of facts where the husband is not a party to the deed transaction. "But the situation is otherwise when the husband is not a party to the purchase." *Id.* at 905. The court pointed to a previous case, *Kearse v. Kearse*, 276 S.W. 690 (Tex. [Comm'n Op.] 1925), "where the transaction was between the wife and her daughter, the consideration being all in the form of notes signed by the former only." *Hodge*, 277 S.W.2d at 905. The supreme court noted that the *Kearse* court had "emphasized the fact of nonparticipation of the husband" in distinguishing prior precedent. *Hodge*, 277 S.W.2d at 905. The *Kearse* court recognized the difference between "presuming a gift" when the husband is a party to the transaction and not making such a presumption when he is not a party to the transaction. *Hodge*, 277 S.W.2d at 905. The supreme court then recognized the strangeness of a third party grantor characterizing property between a husband and wife: "[I]n connection with the parol evidence rule, a third party grantor, not interested in the community one way or another, has no standing whereby to impose a particular character on the estate conveyed; so the recital in his deed may be regarded *merely as one of an existing fact, which may properly be disputed by evidence, as distinguished from an*

*operative portion of the deed, which it probably is where the husband is a party and which ought*

*not to be contradicted by parol.*" *Id.* (emphasis added).

The supreme court concluded that "in the latter instance not only is the husband free of the parol evidence rule in proving the community nature of the transaction as against the separate property recitals in the deed, but also there would seem to be little more reason to apply a presumption from the recitals in favor of the wife's separate estate than to apply the elemental presumption to the contrary effect." *Id.* "It is accordingly reasonable to say that in such a case, once there is adduced evidence of probative force tending to show the property to have been purchased with community funds, the question as to the status of the property is ordinarily one of fact." *Id.*

The supreme court then applied the above principles to the facts of its case. With respect to all three properties at issue (i.e., the Wilson, Stewart, and Walker properties), the husband testified he "knew generally about the purchase of each property, including the price of at least one." *Id.* at 904. He had "actually inspected one or more" of the properties before they were purchased by his wife. *Id.* And, he admitted he had signed the "bank note for the Wilson purchase." *Id.* Nevertheless, he "insisted that he never knew of, or consented to, the terms of the deeds in so far as they purported to make the respective premises the separate property of [his wife]." *Id.*

With respect to the Wilson property, the supreme court concluded that the husband's signature on the bank note made him a party to the transaction:

> [W]e first conclude that the joinder of the [husband] in the bank note in the Wilson purchase makes an important difference between it and the Stewart and Walker purchases. Regarding the two latter, which we will discuss more fully further on, there may well be ground to support implied findings of the trial judge in accord with the testimony of the [husband] to the effect he was [not] a party to the transactions, and that the property was purchased with community funds. But to say that the [husband] was not a party to the Wilson [purchase] in the face of what he admits knowing generally, plus the fact that he was expressly a party to the bank note and deed of trust, would be too much at variance with human experience, in

- 11 -

the absence of proof of duress or fraud on the part of the [wife] or the bank, of which there was none.

*Id.* at 905. According to the court, because the husband "was undoubtedly a party to the transaction," it could "thus hold the Wilson property to be separate on the theory of implied gift from the [husband] as a matter of law, considering the recitals in the deed that the premises were conveyed as separate property for separate property consideration, whatever be the actual character of the consideration and despite that the note may have bound the community." *Id.* The supreme court explained that the parol evidence rule barred the husband from presenting evidence showing that the property in question was community property:

> [W]e may say with almost equal certainty that the [husband] was cut off by the parol evidence rule from showing the consideration or nature of the estate conveyed, should these be at variance with the mentioned recitals. That the note itself did not speak of separate funds (although it did say "borrowed by [wife]") and was not referred to in the deed, does not change the result. It was all one transaction, and the deed recited "from her separate estate."

*Id.* (citations omitted). Because the parol evidence barred the husband from bringing any evidence relating to the consideration or nature of the estate conveyed and because there was no evidence of fraud or duress, the supreme court concluded the Wilson property was the wife's separate property. *Id.* Thus, according to the supreme court, if Spouse A is a party to the deed transaction and the deed "recites either that the land is conveyed to [Spouse B] as her separate property, or that the consideration is from her separate estate, or includes both types of recitation," unless Spouse A has "proof of duress or fraud on the part of" Spouse B or the grantor, the recital in the deed has conclusive effect on the characterization of the property as the separate property of Spouse B because Spouse A will be prevented "by the parol evidence rule from showing" either that community funds were used for the purchase or that "the nature of the estate conveyed" was community. *Id.* at 904, 905.

The supreme court then considered whether the husband had also been a party to the Stewart and Walker transactions and concluded he had not, explaining that he had not signed any papers in connection with either purchase transaction and had no detailed knowledge of the deeds. *Id.* at 906. In looking at the evidence presented in the case, the supreme court explained that there was some evidence rebutting deed recital's separate property presumption. *See id.* at 906-07 ("[C]onsidering the substantial amounts of the community type funds in relation to the amount of separate funds involved and the large total consideration paid for the properties, as well as the absence of evidence as to other separate property that might have been employed, there is a permissible inference that some of the community type went into the purchases."). Thus, the burden shifted back to the wife's estate to show that the property was separate:

> Conceivably the otherwise community portion of the funds might, prior to the use of both types in the purchases, have somehow become the separate property of the [wife], so as to result in the purchased property being clearly separate because acquired entirely with separate funds. *But the burden to show that fact would be on the [wife's estate], and we cannot say that they have established it as a matter of law.*

*Id.* at 907 (emphasis added). Because the supreme court could not "say that the finding of the trial court that the Stewart and Walker properties were community [was] wrong as a matter of law," it "must accordingly treat them as community." *Id.* Thus, according to the supreme court, if Spouse A was not a party to the deed transaction, to rebut the deed recital's separate property presumption, Spouse A need only present some evidence that the property was, in fact, community property. *See id.* at 906-07. And, unlike when Spouse A is a party to the deed transaction, the parol evidence rule does not bar Spouse A from presenting such evidence. *See id.* at 905. Once Spouse A presents some evidence to rebut the deed recital's separate property presumption, the burden shifts back to Spouse B to prove that the property is actually separate property. *See id.* at 906-07.

*3. Supreme Court in* Henry S. Miller *follows its previous reasoning in* Hodge.

In the 1970 opinion, *Henry S. Miller Co. v. Evans*, 452 S.W.2d 426 (Tex. 1970), the supreme court once again considered a deed recital. Henry S. Miller Co. ("Miller") had sued the sheriff for his failure to levy execution on a property. *Id.* at 428. The property in question had been conveyed to Nancy Shoaf during her marriage to Joseph Shoaf. *Id.* The deed recited "a consideration of $1.00 and a vendor's lien note for $8,000.00, paid and to be paid out of Nancy Shoaf's 'sole and separate estate,' and that this property was conveyed to her as her 'sole and separate estate.'" *Id.* at 428-29. Joseph Shoaf was an experienced real estate dealer and co-signor of the note on the property. *Id.* at 429. He handled all the negotiations involved in the transaction, and Nancy did not participate in any of the negotiations. *Id.*

> The parol testimony of Joseph Shoaf, admitted in evidence over the Sheriff's objection, was, in substance, as follows: that he was an experienced real estate dealer; that the "property was sold to me," but the title was taken in his wife's name because he was heavily in debt, and "if something should happen to me, this was something that could provide an income"; that he co-signed the vendor's lien note and paid the $300.00 down payment and some utility bills and taxes; that he collected the rent payments and gave them to his wife, and she deposited them in her separate account out of which she made all of the mortgage payments; that he told the attorney who prepared the deed that "he wanted title to the property to be put in her name in case anything should happen," but "told him I wanted it to be community property"; and that he wanted to fix it so that creditors could not get the title away in case something happened.

*Id.*

More than four years after execution of the deed, Joseph Shoaf executed a note payable to Miller in the principal sum of $37,500.00. *Id.* The sole collateral for the note was the property in question. *Id.* When Joseph Shoaf defaulted on the note, Miller obtained a judgment against Joseph Shoaf. *Id.* Miller thereafter sought a levy of execution on the property, claiming that it was community property and thus subject to execution. *Id.* at 430.

The supreme court explained that "[b]efore Miller offered evidence to show that the property was acquired during coverture, which would give rise to the presumption that this was community property, the Sheriff introduced into evidence the deed to Nancy Shoaf containing the recitals to the effect that the land was conveyed to her as her sole and separate estate, and that the consideration was paid and to be paid out of her separate estate." *Id.* "As a result of the recitals in the deed, *no presumption of community property existed.*" *Id.* (emphasis added). "By the introduction of the deed containing these recitals into evidence, the Sheriff established a prima facie defense that the Amanda Street property was the separate property of the wife, Nancy Shoaf, and not subject to execution." *Id.*

The supreme court explained that "the extrinsic evidence offered to contradict the express recitals in the deed that the property was to be the separate property of Nancy Shoaf was inadmissible." *Id.* at 431. According to the court, "[u]nder this record, Miller was unable to introduce extrinsic evidence (e.g., payment by the community and subjective intention of the parties) which would establish a resulting trust, and in turn, contradict the express recitals in the deed to the effect that this was the separate property of Nancy Shoaf, without first tendering competent evidence that there had been fraud, accident and mistake in the insertion of the recitals in the deed." *Id.* The court noted that Nancy Shoaf had not participated in the negotiations and that "Joseph Shoaf, an experienced real estate dealer, handled all of these negotiations and co-signed the note." *Id.* "As such, he had knowledge of the terms of the deed and in law would be treated as a party to the transaction." *Id.* The court explained that "[t]here was no fraud, accident or mistake in the insertion of these recitals in the deed." *Id.* The court then considered "the record to determine whether the deed to Nancy Shoaf was made in fraud of subsequent creditors." *Id.* at 432. The court noted that Miller had not produced any evidence that the deed to Nancy, "executed and recorded four years prior to the origin of [Miller's] claim and subsequent judgment, was made in fraud of

subsequent creditors." *Id.* Thus, the supreme court held the property in question was "the separate property of Nancy Shoaf by virtue of the recitals in the deed." *Id.* at 433.

The supreme court's holding in *Henry S. Miller Co.* is consistent with its analysis in *Hodge*: if the spouse is a party to the transaction, absent proof of fraud, accident or mistake in the insertion of the recitals in the deed, the deed recitals have a conclusive effect and no parol evidence is admissible to prove the recitals are not accurate.[3]

   C. *Because Elizabeth is not a Party to the Deed Transactions, the Deed Recitals Constitute Only Prima Facie Evidence that the Oil and Gas Interests are Rees's Separate Property.*

In applying supreme court precedent to the facts of our case, we first note it is undisputed the oil and gas interests in question were acquired by Rees during his marriage to Elizabeth. While there is evidence Elizabeth was aware in general of the transactions, it is undisputed that she did not participate in any negotiations with respect to the oil and gas interests or sign any documents relating to them. Thus, we conclude the record reflects that she was not a party to any of the deed transactions. Pursuant to supreme court precedent, once the Weed Appellants presented the deeds containing the recitals that the properties had been conveyed to Rees as his sole and separate property, the community property presumption was "displaced by a presumption in favor of the separate estate" of Rees. *Hodge*, 277 S.W.2d at 904. That is, the recitals found in the deeds

---

[3] Since the supreme court's holding in *Henry S. Miller Co.*, courts of appeal have followed the precedent set by the supreme court with regard to the separate property presumption created by a deed recital. *See In re Marriage of Moncey*, 404 S.W.3d 701, 712-13 (Tex. App.—Texarkana 2013, no pet.) (explaining that a separate property recital in an instrument displaces the community property presumption and becomes prima facie evidence that the property is separate property and that the spouse contending the property is community property then has the burden to rebut the separate property presumption); *Sanders v. Sanders*, No. 02-08-00201-CV, 2010 WL 4056196, at *16 (Tex. App.—Fort Worth 2010, no pet.) (same); *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no pet.) (same); *see also Cardenas v. Cardenas*, No. 13-06-00064-CV, 2017 WL 1089683, at *2 (Tex. App.—Corpus Christi 2017, no pet.) (explaining that a separate property presumption arises when the instrument of conveyance contains a separate property recital and that this separate property recital replaces the community property presumption and "creates in its place a rebuttable presumption of separate property"); *K.B. v. N.B.*, 811 S.W.2d 634, 642 (Tex. App.—San Antonio 1991, writ denied) ("The community property presumption applies even though the deed conveyed title to the husband in his name, *there being no recital in the deed that the land was conveyed to him as his separate property or that he bought it with separate funds or credit*.") (emphasis added).

constituted "prima facie evidence of a gift," which must be rebutted by Frost Bank. *Henry S. Miller*, 452 S.W.2d at 430.

### D. Time, Toil, and Effort of Rees in Acquiring the Oil and Gas Interests

Frost Bank argues because Rees acquired the oil and gas interests through his time, toil, and effort, even if they were purchased with separate funds, they became community property. Under Texas's community property system, "[a]ny property or rights acquired by one of the spouses after marriage by toil, talent, industry or other productive faculty is community property." *Norris v. Vaughan*, 152 Tex. 491, 260 S.W.2d 676, 682 (1953); *see also Graham v. Franco*, 488 S.W.2d 390, 392 (Tex. 1972). "The rationale behind this premise is that each spouse's time, talent, and efforts are assets of the community estate." 38 ALOYSIUS A. LEOPOLD & GERRY W. BEYER, TEXAS PRACTICE: MARITAL PROPERTY & HOMESTEADS § 14.12 (1993 & Supp. 2017-18). However, while each spouse's time, talent, and efforts are community assets, a spouse does have a right to spend *a reasonable amount of time, talent, and effort* in caring for, preserving, making productive, and selling his or her separate property "without impressing a community character upon that [property]." *Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982); *see Norris*, 260 S.W.2d at 680-81. Thus, when a spouse uses a reasonable amount of time, talent, and effort, a spouse's separate property may undergo changes and mutations, be sold and the proceeds invested, resold, and reinvested, and yet preserve its separate character as long as the spouse can trace the separate character of the funds. *See Norris*, 260 S.W.2d at 681 (explaining that "[r]easonable control and management is necessary to preserve the separate estate and put it to productive use" and "community character [will] not be impressed upon" separate property so long as only a reasonable amount of time, toil and effort was used).

However, what happens when a spouse spends an *unreasonable amount of time, toil, and effort* increasing the value of his separate property? Case law appears to reflect the outcome will

depend on the degree to which the spouse used his community time, toil, and effort on increasing the value of his separate property. "[W]hen a spouse takes a separate property asset and with community labor significantly enhances its value, *the end product may be transmuted into community property*." Oliver S. Heard Jr. et al., *Characterization of Marital Property*, 39 BAYLOR L. REV. 909, 923 (1987) (citing *De Blane v. Hugh Lynch & Co.*, 23 Tex. 25 (1859)) (emphasis added).

In *Norris v. Vaughan*, 152 Tex. 491, 260 S.W.2d 676, 677 (1953), the supreme court recognized this rule of community character being impressed upon separate property. Before his marriage, the husband in *Norris* owned as his separate estate (1) a 7/8ths determinable fee, as lessee, in seven producing gas wells ("the Pakan Wells"); (2) a 1/4th interest in the Shamrock Gas Co., which was a partnership; (3) a 1/4th interest in the Vaughan Well Co., which was also a partnership; and (4) a 1/2 interest in the partnership of Pendleton & Vaughan. *Id.* at 678. With respect to the Pakan wells, the petitioner, who was the daughter and only heir of the deceased wife, argued "that, even if the gas produced is to be considered [the husband]'s separate property by virtue of being a sale of the separate estate, *community labor, talent and funds were expended on its production and sale, thus impressing community character upon the gas*." *Id.* at 680 (emphasis added). According to the supreme court, "[t]his is *a well recognized theory*." *Id.* (emphasis added). The court noted that in the cases relied on by petitioner for this theory, "it is obvious that a *great deal of community effort was required to transmute the separate property in to a new and more valuable state*." *Id.* (emphasis added).

The supreme court then looked at the circumstances surrounding the Pakan wells. It explained there was no co-mingling of funds, and "no showing that community funds were used in these maintenance operations." *Id.* The husband's uncontroverted testimony was that he made only one trip to the "Pakan" area during his marriage and the wells required no management. *Id.*

The husband entered into the lease with Lone Star Gas Co. and "thereafter had nothing to do with the leases, except to collect for his part of the gas produced." *Id.* According to the supreme court, "since there was not such an expenditure of community funds or effort as to impress community character on the gas produced from the 'Pakan' wells and the $80,661 received as profit, the gas produced and the proceeds therefrom remain separate property." *Id.* Further, the community estate had no right of reimbursement with respect to the husband's efforts regarding these wells because his efforts had been no more than necessary to maintain his separate property. *See id.*

With respect to the husband's 1/4 interest in the Shamrock Gas Co., the supreme court explained "[t]his partnership maintained distribution facilities and retailed natural gas to residences in and around Shamrock, Texas." *Id.* at 680-81. Shamrock Gas Co. "buys its natural gas from the Vaughan Well Co. and owns no gas producing property of its own." *Id.* at 681. The court noted the husband had acquired his interest in the partnership before his marriage and drew salary and profits from the company during his marriage. *Id.* The court explained the husband also owned a 1/4 interest in the partnership known as the Vaughan Well Co. *Id.* "This partnership's sole business is the acquisition of gas wells by drilling under lease agreements and selling gas production to Shamrock Gas Co." *Id.* Before his marriage, Vaughan Well Co. owned three producing gas wells ("the O'Gorman No. 1 and No. 2, and the Sims wells"). *Id.* The court reasoned that "[a]s to the matter of community labor or talent utilized in the production of the natural gas produced by these wells," the husband has a "right to manage, control, and dispose of his separate property." *Id.* "Reasonable control and management is necessary to preserve the separate estate and put it to productive use." *Id.* The court concluded "the production and maintenance operations on these gas wells are necessary to their use and preservation and are in the nature of reasonable control and management of the separate estate." *Id.* Thus, the court held "community character would not be impressed upon these wells by means of [the husband]'s activities in relation to production and

maintenance" and the husband's "interest in the Sims and O'Gorman wells remains separate property." *Id.*

The supreme court then considered the facts surrounding two other wells ("the Hill and Cantrell wells"), which had been drilled by the Vaughan Well Co. and the right to drill the wells had been secured after the date of the husband's marriage. *Id.* The husband had acquired a one-fourth interest in the Hill and Cantrell leases through an assignment and "in recognition of the one-fourth interest which he owned in the Vaughan Well Co., a partnership." *Id.* "The leases were taken in the name of A.N. and B.F. Holmes for the benefit of four partners, A.N. Holmes, B.F. Holmes, W.S. Pendleton, and Hal H. Vaughan [the husband]." Pendleton & Vaughan (the husband's partnership) "drilled ten gas wells, known as the McDowell and Taylor wells, under 'farmout' agreements with Magnolia Oil Co." *Id.* By the terms of these agreements, Magnolia assigned certain lease interests to Pendleton & Vaughan upon completion of a well in the lease area. *Id.* The supreme court emphasized that "[n]egotiation and acquisition of the 'farmout' agreements were made after" the husband's marriage, "and were at least partially due to his talent and labor." *Id.* The supreme court concluded that the "community acquired the right to drill the Hill and Cantrell wells under the oil and gas leases heretofore mentioned, and negotiations and acquisition of the 'farmout' agreements (the McDowell and Taylor Wells) were entered into with Magnolia Oil Company after the [husband]'s marriage." *Id.* The supreme court noted that the Hill and Cantrell oil leases recited a cash consideration. *Id.* at 681-82. According to the supreme court, the "community's acquired rights were fixed and determined at the time the oil leases were executed and the 'farmout' agreements were entered into." *Id.* at 682. "The community rights thus acquired cannot be nullified merely because the [husband] elected to use separate funds in drilling the Hill and Cantrell wells under the oil and gas leases, and in carrying out his agreement with reference to the McDowell and Taylor wells." *Id.* The supreme court emphasized that "[a]ny

- 20 -

property or rights acquired by one of the spouses after marriage by toil, talent, industry or other productive faculty is community property." *Id.* Thus, "the right to drill the McDowell and Taylor wells and the Hill and Cantrell wells was a community asset and the dry gas rights obtained by the drilling of the wells are community in nature." *Id.* The supreme court explained the husband's separate estate that "would be entitled to reimbursement by the community estate for funds expended in behalf of the community." *Id.*

We note that the Weed Appellants argue that even if the properties in question were acquired by Rees's time, toil, and effort, community character could not be impressed upon his separate property. Instead, they argue the community estate would only be entitled to a reimbursement claim. For support, they cite *Jensen v. Jensen*, 665 S.W.2d 107 (Tex. 1984). In *Jensen*, the husband bought shares of stock four months prior to his marriage. The supreme court explained that when separate property of a spouse increases in value during marriage, the property owned by the spouse before marriage will remain separate property, but "the community will be reimbursed for the value of time and effort expended by either or both spouses to enhance the separate estate of either, other than that reasonably necessary to manage and preserve the separate estate, less the remuneration received for that time and effort in the form of salary, bonus, dividends and other fringe benefits, those items beings community property when received." *Id.* at 109. However, the *Jensen* "method of computing the right of reimbursement is arguably applicable only to a fact situation *where the separate property has remained in a constant form*, one that existed at the beginning of the marriage and continued to appreciate in value from the spouse's normal efforts as well as from natural growth or economic market fluctuations." 38 ALOYSIUS A. LEOPOLD & GERRY W. BEYER, TEXAS PRACTICE: MARITAL PROPERTY & HOMESTEADS § 14.12 (1993 & Supp. 2017-18) (emphasis added). In this case, the property has not remained in constant form from the beginning of Rees's marriage to his death. Instead, the oil and gas interests were

acquired *during his marriage* and, even if they were purchased with Rees's separate funds, they changed in form from cash to real property interests. Thus, *Jensen* is distinguishable from the facts presented here.

In applying the supreme court precedent above, it is possible that even if the oil and gas interests were purchased with separate funds, the degree to which Rees used his time, toil, and effort in acquiring the oil and gas interests could have impressed a community character on the oil and gas interests. Whether the appellate record contains evidence of Rees's time, toil, and talent sufficient to rebut the prima facie evidence of the deed recital depends on the circumstances of Rees's oil and gas business and his acquisition of oil and gas interests during his marriage. However, before we can determine if the evidence in the record is sufficient to rebut the separate property presumption, we must consider the burden placed on a party attempting to rebut the separate property presumption.

### E. Presumptions: Distinction Between Morgan and Thayer Presumptions

"Over the years, numerous approaches to the treatment of presumptions [in civil cases] have been urged." 1 STEVEN GOODE & OLIN GUY WELLBORN III, TEXAS PRACTICE: TEXAS RULES OF EVIDENCE § 301.2 (4th ed. 2016). "One, traditionally associated with James Bradley Thayer, gives presumptions only minor effect." *Id.* "A Thayer-type presumption shifts only the burden of production to the opponent of the presumption." *Id.* "In other words, once the presumption's proponent establishes the existence of the basic fact, the factfinder must find the presumed fact exists unless the opponent meets the burden of production as to the presumed fact." *Id.* "This means that the opponent must produce enough evidence so that a reasonable juror could find the non-existence of the presumed fact." *Id.* "If the opponent meets this burden, the presumption disappears from the case; the case proceeds as if there were no presumption." *Id.* "If, however, the opponent fails to meet its burden of production, the factfinder must find that the presumed fact

exists." *Id.* Under a Thayer-type presumption, the burden imposed on the party seeking to rebut the presumption "is slight." *Id.* All a party "must do to eliminate the presumption from the case is produce enough evidence so that a reasonable juror could find the non-existence of the presumed fact." *Id.* "As a result of the ease with which Thayer-type presumptions can be defeated, they are frequently referred to as 'bursting bubble' presumptions." *Id.* "Many presumptions in Texas are given the minimal, Thayer-type effect." *Id.* Thus, in discussing the general rules governing presumptions, the Texas Supreme Court described rules governing a Thayer-type presumption:

> The presumption is subject to the same rules governing presumptions generally. Its effect is to shift the burden of producing evidence to the party against whom it operates. Once that burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and is not to be weighed or treated as evidence. The evidence on the issue is then evaluated as it would be in any other case. The presumption has no effect on the burden of persuasion. The facts upon which the presumption was based remain in evidence, of course, and will support any inferences that may be reasonably drawn from them.

*General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993).

Another type of presumption, called a "Morgan Presumption" after Professor Edmund M. Morgan, "shifts to the opponent not only the burden of producing evidence but the burden of persuasion as well." Jerome A. Hoffman, *Thinking About Presumptions: The "Presumption" of Agency From Ownership as Study Specimen*, 48 ALA. L. REV. 885, 896-97 (1997). "Thus, once the proponent establishes the basic facts of a presumption, the factfinder would be required to find the presumed fact unless the opponent actually satisfies the factfinder of the presumed fact's non-existence." 1 STEVEN GOODE & OLIN GUY WELLBORN III, TEXAS PRACTICE: TEXAS RULES OF EVIDENCE § 301.2 (4th ed. 2016). "Merely offering evidence of its non-existence would not suffice to remove the presumption from the case." *Id*.

In determining whether the separate property presumption created by the deed recitals is a Thayer-type presumption or a Morgan-type presumption, we look again to *Hodge v. Ellis*, 154

Tex. 341, 277 S.W.2d 900 (1955). In *Hodge*, a spouse who was a party to the deed transaction was prevented by the parol evidence rule from rebutting the separate property presumption; the deed recital was given conclusive effect. *See id.* at 905 ("Since [the spouse] was undoubtedly a party to the transaction, we must thus hold the Wilson property to be separate on the theory of implied gift from the respondent-plaintiff as a matter of law . . . ."). However, when the spouse was not a party to the deed transaction, as here, the spouse was allowed to rebut the separate property presumption with parol evidence. *Id.* Once the court determined the spouse had rebutted the separate property presumption with respect to two of the properties at issue, the court explained that the burden of persuasion was back on the spouse claiming the party to be separate property:

> Conceivably the otherwise community portion of the funds might, prior to the use of both types of purchases, have somehow become the separate property of the testatrix [wife], so as to result in the purchased property being clearly separate because acquired entirely with separate funds. But the burden to show that fact would be on the [executor of the estate and her remaining beneficiaries], and *we cannot say that they have established it as a matter of law*.

*Id.* at 907 (emphasis added). In looking at the supreme court's application of facts to the law in *Hodge*, we conclude the separate property presumption created by the deed recitals is a Thayer-type presumption. Thus, to rebut the separate property presumption, Frost Bank needed merely to produce evidence from which a reasonable factfinder could conclude that the oil and gas interests acquired during Rees and Elizabeth's marriage were community property. *See* 1 STEVEN GOODE & OLIN GUY WELLBORN III, TEXAS PRACTICE: TEXAS RULES OF EVIDENCE § 301.2 (4th ed. 2016).

It is undisputed in this case that Rees's profession was the acquisition, exploration, development and management of oil and gas interests. Elizabeth Rees testified that during her marriage, "the majority of his work" was "oil and gas." Rees "researched oil and gas" and "read a lot about oil and gas opportunities." She explained that he was "seeking to purchase more and more minerals." Elizabeth testified that he "would take the income that he earned off the oil and

gas activity that he was involved in and use that to support the family." She explained that "[t]he majority of income to support the family came from his oil and gas activities." "That was our business, and that's where our main income came from." According to Elizabeth, Rees used his connections to actively seek out new oil and gas interests to acquire. She affirmed Rees negotiated the terms of those acquisitions and related agreements.

Richard O. Weed agreed that for most of his adult life, his Uncle Rees "was in the oil and gas business." Richard O. Weed affirmed that Rees "owned, bought, and sold real property and personal property that consists of mineral interests, royalty interests, overriding royalty interests, working interests, and other assets related to the oil and gas business." Jon Daubert with Frost Bank agreed that Rees's primary business was oil and gas.

The record further reflects that from 2000 to the time Rees died in 2011, Rees acquired during their marriage, almost sixty oil and gas interests. Over fifty of those interests are at issue in this appeal and contain the deed recital "sole and separate" property language. Given the amount of oil and gas interests acquired, the testimony that oil and gas was Rees's primary business, the testimony that Rees spent his time researching possible acquisitions and negotiated the terms of the sale, the testimony that Rees used his oil and gas business to support the family, we hold that there is evidence in the record from which a reasonable factfinder could conclude that, even if the oil and gas interests at issue were purchased with Rees's separate funds, the degree to which Rees used his time, toil, and effort to acquire the oil and gas interests impressed a community character upon the oil and gas interests. *See Norris*, 260 S.W.2d at 680. Thus, we conclude Frost Bank rebutted the separate property presumption created by the deed recitals.

Because Frost Bank has rebutted the separate property presumption, the presumption "disappears and is not to be weighed or treated as evidence." *General Motors*, 873 S.W.2d at 359 (citation omitted). We evaluate the summary judgment evidence as we "would in any other case."

*Id.* And, in any other case on this issue, the community property presumption is applicable. "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property," and the "degree of proof necessary to establish that property is separate property is clear and convincing evidence." TEX. FAM. CODE ANN. § 3.003. The undisputed evidence in this case shows the oil and gas interests at issue were acquired by Rees during his marriage to Elizabeth. *See id.* § 3.002 (defining "community property" as "property, other than separate property, acquired by either spouse during marriage"). The undisputed evidence also shows that Rees did not acquire the oil and gas interests by gift, devise, or descent. *See id.* § 3.001 ("A spouse's separate property consists of . . . the property acquired by the spouse during marriage by gift, devise, or descent . . . .").

To rebut the community property presumption and create a fact issue in the summary judgment proceeding, the Weed Appellants must have produced evidence from which a reasonable factfinder could conclude they had met their burden, by clear and convincing evidence, of proving that the oil and gas interests were separate property. This court has explained that "[t]o overcome the community property presumption, the spouse claiming certain property as separate has the burden to trace and clearly identify the property claimed to be separate." *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* "And, as a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community property presumption." *Id.* It is undisputed in this case that tracing of the funds used to purchase the oil and gas interests is impossible because the relevant bank records no longer exist. The only evidence the Weed Appellants produced to show that the oil and gas interests were Rees's separate property is the language in the deeds themselves. *See General Motors*, 873

S.W.2d at 359 (explaining that after a Thayer-type presumption is rebutted, "[t]he facts upon which the presumption was based remain in evidence . . . and will support any inferences that may be reasonably drawn from them"). This mere language in the deeds is not sufficient to overcome the community property presumption as a matter of law. *See Garza*, 217 S.W.3d at 548.

## CONCLUSION

Because we have determined that Frost Bank rebutted the separate property presumption created by the deed recitals, the separate property presumption disappeared and we evaluate this summary judgment record as we would in any other case. Because of the now applicable community property presumption, the Weed Appellants would have the burden to show by clear and convincing evidence that the oil and gas interests at issue were Rees's separate property. It is undisputed in this case, however, that no financial records exist to trace the funds used by Rees to purchase the oil and gas interests. Thus, the only evidence supporting the Weed Appellants' assertion that the oil and gas interests were Rees's separate property is the language in the deeds themselves. These deed recitals, however, by themselves, are not sufficient evidence to overcome the community property presumption as a matter of law. Summary judgment was therefore correctly granted in favor of Frost Bank. We affirm the judgment of the trial court.

Karen Angelini, Justice